UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

------------------------------------------X
United States of America            :
                                    :      Docket No.: 3:20CR00260-001 RS
         v.                         :
                                    :      Honorable Richard Seeborg
Jack Abramoff,                      :      Chief United States District Judge
                                    :
         Defendant                  :
                                    :
                                    :
------------------------------------X

**SENTENCING MEMORANDUM OF DEFENDANT JACK ABRAMOFF**

Richard Weber (*pro hac vice*)
HAYNES AND BOONE LLP
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112
Richard.Weber@haynesboone.com
(212) 835-4879

*Attorneys for Defendant Jack Abramoff*

**Table of Contents**

**INTRODUCTION** ..................................................................................................................... 1

I. **PERSONAL BACKGROUND** ........................................................................................ 3

    A. Mr. Abramoff's Upbringing ............................................................................... 3

    B. Mr. Abramoff's Youth and College Years ........................................................ 3

    C. Mr. Abramoff's Life After College .................................................................. 4

    D. Mr. Abramoff's Family ..................................................................................... 4

    E. Mr. Abramoff's Health ...................................................................................... 5

II. **MR. ABRAMOFF'S CHARITABLE ACTIVITIES AND DEDICATION TO HIS COMMUNITY** ............................................................................................. 6

    A. Philanthropy and Financial Support to Jewish Schools and Kosher Restaurants ........ 7

    B. Quiet Financial Assistance to Families in Crisis .............................................. 9

    C. Mr. Abramoff's Dedication to His Community ............................................... 9

    D. Mentorship, Ethical Guidance, and Second-Chance Advocacy ..................... 10

    E. Mr. Abramoff's Other Activities .................................................................... 11

III. **MR. ABRAMOFF'S DEDICATION TO HIS FAMILY** .............................................. 12

IV. **FACTS OF MR. ABRAMOFF'S CASE** ....................................................................... 12

V. **A NON-CUSTODIAL SENTENCE OF PROBATION IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO SATISFY THE OBJECTIVES OF 18 U.S.C. § 3553(A)** ................................................................................................ 13

    A. A Doward Departure is Warranted Because of Mr. Abramoff's Substantial Cooperation ................................................................................... 13

    B. A Downward Variance is Warranted Because of Mr. Abramoff's Health, Age, and Exceptional Charitable and Good Works ............................. 15

**CONCLUSION** ....................................................................................................................... 18

Defendant Jack Abramoff respectfully submits this memorandum in connection with his upcoming sentencing scheduled for November 18, 2025, at 2:30 p.m. This memorandum and the attached exhibits are submitted on behalf of Jack Abramoff to assist the Court in sentencing and to support the Government's request for a non-custodial sentence of probation.

**INTRODUCTION**

Jack Abramoff, 66 years of age, a husband, a father, and a grandfather, stands before the Court for sentencing having pleaded guilty to a two-count Information, filed on July 14, 2020, charging him with violations of 18 U.S.C. § 371, Conspiracy (Count One); and 2 U.S.C. §§ 1603(a) and 1606(b), Lobbying Disclosure Act (Count Two). Those charges relate to false and misleading statements made by Mr. Abramoff and a co-defendant Rowland Marcus Andrade to potential purchasers of a proposed new cryptocurrency called AML Bitcoin, and lobbying a member of the U.S. Congress without registering. Less than a month later, on July 14, 2020, Mr. Abramoff accepted responsibility for his criminal conduct and pleaded guilty to both counts of the Information.

In pleading guilty to the charges, Mr. Abramoff made the difficult decision to accept responsibility for his wrongdoing and to immediately and substantially cooperate with the Government. He began doing so through a series of Government proffers. As part of that process, Mr. Abramoff provided the Government with substantial information concerning his co-defendant Andrade. From day one, Mr. Abramoff was committed to assisting the Government with its case against Mr. Andrade, including attending numerous meetings with the FBI agents and prosecutors, explaining documents and reviewing key evidence in the case. Most compelling, despite being diagnosed with Stage IV Non-Hodgkin's lymphoma in September 2024 and undergoing months of grueling chemotherapy, in a severely weakened state, Mr. Abramoff mustered the strength to testify at Andrade's trial in February 2025. Based in part on

Mr. Abramoff's key testimony, on March 12, 2025, a jury convicted Andrade of wire fraud and money laundering, and he was later sentenced by this Court to 84 months in prison.

In this Memorandum, in addition to highlighting the substantial cooperation of Mr. Abramoff, which is detailed in the Government's 5K1.1 motion, we provide the Court with additional information regarding Mr. Abramoff's personal history and characteristics, which we feel are relevant to sentencing. In that regard, a wide range of Mr. Abramoff's friends, family, colleagues, and clergy have submitted over 50 letters of support. Copies of those letters are attached hereto as Exhibit A. Those letter writers—many of whom have known Mr. Abramoff for decades and, in some cases, his entire life—offer a detailed and consistent portrait of Mr. Abramoff's dedication to family, friends, community, and his Jewish faith. Of special importance in this case, where the crimes at issue ended over 6 years ago, are the descriptions of the growth and development that Mr. Abramoff has experienced since then.

Also discussed herein are the challenges Mr. Abramoff has faced since pleading guilty, including his ongoing battle with Stage IV Non-Hodgkin's lymphoma, which was diagnosed about a year ago in September 2024, as well as his son's concurrent battle with Hodgkin's lymphoma, which was also diagnosed last year. Mr. Abramoff has completed his initial chemotherapy regime, which lasted most of this year, and is presently being closely monitored by his doctors, as the cancer from which he suffers leaves latent cancer cells in the body which could become active over time. Furthermore, Mr. Abramoff's recovery is hampered by his suppressed immune system, which has left him at high risk of infection. Consequently, Mr. Abramoff is extremely careful not to be exposed to the public and limits his interactions with others. In fact, since the completion of his chemotherapy cycles, he has been infected with COVID and other viruses and illnesses due to his vulnerable and compromised immune system.

As noted above, Mr. Abramoff takes full responsibility for his crimes. He remains deeply

apologetic for the harm that his conduct has caused to the victims. Nonetheless, we respectfully submit that, in light of his exemplary cooperation, the other aspects of his personal history and characteristics, as well as his significant health issues, as elaborated upon below, a non-custodial sentence of probation would be sufficient but not greater than necessary to serve the purposes set for in 18 U.S.C. § 3553(a).

I.  **PERSONAL BACKGROUND**

  A.  **Mr. Abramoff's Upbringing**

Jack Abramoff was born on February 28, 1959, in Atlantic City, New Jersey, and lived there until the age of 10, when his family relocated to California. PSR ¶¶65-66. He is the second of three children born to Franklin and Jane Abramoff, who are both now deceased. *Id.* His mother passed away at the age of 75 from complications related to liver cancer. *Id.* His father passed away in 2018 at age 91 from kidney failure. *Id.* Mr. Abramoff's parents remained married at the time of his mother's death. Mr. Abramoff has two siblings, Linda Rosenblatt (age 69), a homemaker currently residing in Cherry Hill, New Jersey, and Robert Abramoff (age 63), an attorney residing in Agoura Hills, California. *Id.* ¶66.

At the age of 13, Jack Abramoff, decided to practice Orthodox Judaism. He used some of the money he made working odd jobs to buy books about his faith and he taught himself Hebrew. He was the first in three generations of his family to adhere to the traditions and practices of his faith, as described below in Section III.

  B.  **Mr. Abramoff's Youth and College Years**

During his youth, Jack Abramoff was an active sportsman, achieving accolades and honors in football and powerlifting, and also participating in soccer, wrestling, and track. He was also an active participant in student Government, running for numerous offices, serving on councils and being elected president of his high school freshman class. PSR ¶67. After high

3

school, Mr. Abramoff studied at Brandeis University, graduating magna cum laude with a degree in English Literature and Opera. *Id.* ¶81. Upon graduation from Brandeis, Mr. Abramoff was elected national head of the student wing of his political party and moved to the Washington, DC area (Silver Spring, Maryland).

### C. Mr. Abramoff's Life After College

After serving two terms as the chairman of the national student wing of the Republican Party, Abramoff was chosen by President Ronald Reagan to become executive director of the President's grass roots lobbying organization on Capitol Hill, Citizens for America. After completing his job at Citizens for America, Mr. Abramoff left politics for a period of time, working with his father's real estate company. He soon joined with his brother in the motion picture industry, where he produced action motion pictures during the late 1980s and 1990s. With the change in control of Congress in 1994, Mr. Abramoff was approached by the law firm then known as Preston Gates to join their lobbying division. For the next decade, Mr. Abramoff built a successful lobbying practice, devoting himself to his clients' causes and taking on numerous pro-bono cases for those in need who could not afford a firm such as Preston Gates, particularly charities and individuals of modest means.

Eventually, Mr. Abramoff moved his practice to another firm, Greenberg Traurig, where his practice continued to grow and thrive. PSR ¶86. As his practice expanded, Mr. Abramoff's income dramatically increased, as did his charitable giving and work. But Mr. Abramoff and his family did not change their lifestyles and continued to basically live the same as they had during much leaner times. As described below, he donated a significant amount of his income to charity.

### D. Mr. Abramoff's Family

Mr. Abramoff married Pamela Abramoff on July 13, 1986, in Washington, DC. PSR ¶71. They met in 1982 at then-President Reagan's birthday celebration at the White House, which

4

Abramoff organized. Pamela is currently employed as a social worker with two non-profit agencies administering state community programs assisting adults with developmental disabilities. *Id.*

Mr. Abramoff and his wife have five adult children: Lev (age 38), Alexander (age 36), Daniel (age 34), Livia (age 32), and Sarah (Livia's twin). *Id.* Mr. Abramoff has a very strong relationship with all of his children. *Id.*

As noted above, Mr. Abramoff's son Alex, who now lives in Israel, was also diagnosed with cancer last year. He returned to the U.S. for his chemotherapy treatment. PSR ¶73. Although he initially achieved remission, he recently experienced a recurrence of the cancer symptoms and is being closely monitored by his doctors in Israel. Additional medical challenges that the family faces include Mr. Abramoff's daughters enduring severe eating disorders that commenced upon Mr. Abramoff's prior incarceration. One of the daughters has struggled with alcohol and prescription drug dependencies for the past several years. His other daughter has suffered additional trauma, having been struck by a car in November 2019 and having suffered traumatic injuries, including a permanent traumatic brain injury. She suffers concussive symptoms, including daily throbbing headaches, dizziness, photosensitivity, vision changes, and cognitive deficits—specifically deficits in visual memory, delayed verbal memory, aspects of attention, concentration, and processing speed, as well as deficits in complex problem-solving skills.

### E.  Mr. Abramoff's Health

In 2024, Mr. Abramoff was diagnosed with "aggressive Stage IV Non-Hodgkin's lymphoma." (Dr. N. Wagner-Johnston Ltr.). Since that time, Mr. Abramoff achieved remission, but only after he was treated with "6 cycles of chemotherapy which led to significant side-effects." (*Id.*). As Mr. Abramoff's doctor explains, despite achieving remission, his cancer is not

considered cured until he remains in remission for five years, and, as noted above, he remains immunosuppressed and is at high risk for infections. (*Id.*). Mr. Abramoff's physician, Dr. Nina Wagner-Johnston, is one of America's leading oncologists and serves as Professor of Oncology at the Johns Hopkins University School of Medicine.

In accordance with Dr. Wagner-Johnston's directives, Mr. Abramoff has avoided gatherings and is examined by Dr. Wagner-Johnston and the Johns Hopkins staff regularly, including periodic advanced medical imaging studies. (*Id.*). In particular, as Dr. Wagner-Johnson explains:

> Although he has completed his treatments, he has ongoing health-related concerns. Mr. Abramoff remains immunosuppressed and is at high risk for infections. If he were to develop an infection, his risk of protracted illness and severe complications is much higher than the average person. I advise my patients to avoid large crowds and to stay away from someone with a known infection. In addition to infection risk, cancer and chemotherapy-related fatigue commonly persist well after completion of therapy.
>
> The highest risk for recurrence of cancer is within the first two years after completion of treatment. His cancer is not considered cured until he remains in remission for five years. Early detection of a recurrence is key in improving outcomes. I routinely follow my patients closely to ensure there are no concerns for possible progression. Patients require routine physical examinations and laboratories every 3 months with periodic radiographic studies.

(*Id.*).    Moreover, as his wife of 40 years explains,

> Jack is still fighting the devastating cancer with which he was diagnosed a year ago. Some days are better than others, but his determination never wavers. He faces his illness with dignity, hope, and courage — refusing to let it define him. Yet the truth is that life has become much harder for him. Age and illness have made every aspect of daily living more difficult, and his physical strength has declined. Despite this, he remains deeply committed to his family and continues to give all of himself to those he loves.

(Pam Abramoff Ltr. of 10/20/25).

**II.    MR. ABRAMOFF'S CHARITABLE ACTIVITIES AND DEDICATION TO**

**HIS COMMUNITY**

Many of his activities, as well his dedication to his community and family, stem from his devotion to Orthodox Judaism. As the sexton of his synagogue notes, Mr. Abramoff is "usually the first person in the synagogue for our early morning prayers," regularly "volunteer[ing] to lead our prayers and ensur[ing] we have a required minyan," without which "our unity in prayer, communal support and outreach would be impacted dramatically." (Raanan Shames Ltr. of 10/19/25; *see also* Howard Feldman Ltr. of 10/22/25 ("Jack's presence enriches our congregation, and his participation in our services and study groups has been consistent and meaningful.")). The Rabbi of his synagogue summed up Mr. Abramoff's commitment to his family, his faith, and the broader community, perfectly:

> As community Rabbi, I have come to know Jack as a person of genuine kindness, humility, and sincerity. He has consistently demonstrated a deep commitment to his family, his faith, and the broader community. Whether by volunteering his time for synagogue programs, assisting families in need, or quietly supporting others through difficult times, Jack has shown a remarkable capacity for generosity and compassion. Jack regularly attends our daily prayer services and learning programs and is often called upon to lead services. It is not an exaggeration to say that Jack is one of the pillars of our congregation. His presence brings warmth and stability, and many would deeply feel his absence. His guidance and involvement have helped nurture an environment of care and unity within our synagogue family.

(Rabbi Bulman Ltr. of 10/23/25).

**A.    Philanthropy and Financial Support to Jewish Schools and Kosher Restaurants**

Among Mr. Abramoff's charitable activities, Mr. Abramoff is perhaps best known for supporting synagogues and schools, and for providing financial support to Jewish families.

As the former president of Mr. Abramoff's synagogue explains: "Rather than keeping his wealth to himself, he has chosen to donate substantial sums to our synagogue and schools." (Barry

7

Graham Ltr. of 10/21/25). Rabbi David Litwack, the U.S. Executive Director of the Save a Child's Heart Foundation, likewise remarked that Mr. Abramoff "tirelessly chair[ed] the boards of private schools with the explicit goal of expanding educational access," and he "has personally, and often anonymously, supported children who did not have the financial wherewithal to attend [Jewish] schools." (Rabbi Litwack Ltr. of 10/16/25).

One notable example is Mr. Abramoff's involvement in the creation of a Jewish high school in Silver Spring, MD, which "he established when he found that no existing school met his standards for educational excellence and ethical development." (Richard Naimer Ltr. of 10/9/25). As his longtime friends remarked, Mr. Abramoff's "efforts were not merely about getting our children through the system." He understood that education was key to their future. "He went out of his way to ensure a professional staff [and] individual resource was added." (Ken and Sarah Sragg Ltr. of 10/19/25). Notably, "the schools and institutions [Mr. Abramoff] established (mostly anonymously) … make up the bedrock of the Silver Spring Jewish community to this day." (Moses Lapin Ltr. of 10/24/25).

Another notable example was Mr. Abramoff's decision to help bolster his Jewish community by opening two kosher family restaurants in Washington, DC, when none existed. He did not do it for the money, but to ensure that the young people of his community had wholesome destination choices. As one community member noted, "[o]ne exemplarily anecdote from the time I can recall are the two Kosher restaurants Jack built to serve the Jewish communities of Greater Washington, who at the time had few kosher options available to them. The running joke was how terribly the restaurants were doing [financially] and if only he would make them non-kosher and market them as Jack Abramoff's restaurants he would instantly make a fortune. He didn't pursue the money, and he avoided the limelight." (Moses Lapin Ltr. of 10/24/25).

8

### B. Quiet Financial Assistance to Families in Crisis

Many of the letters describe a pattern of private, unpublicized support that prevented financial ruin for families in distress. Mr. Abramoff was known for "quietly help[ing] people in financial or personal difficulty, never looking for recognition. His compassion is real, and he gives freely of his time and resources to anyone." (J. Dunkin Ltr. 10/16/25; M. Warner Ltr. of 10/23/25 ("He is in fact a wonderful, generous man who goes out of his way to help others when there is nothing in it for him.")).

One friend of forty-five years writes, "I know of families that but for Jack's unending support would have been forced into bankruptcy, into despair and possibly worse." (B. Waldman Ltr. of 10/9/25). Others echo this theme on deeply personal terms. A community member recalls, "[w]hen my daughter gave birth to quadruplets, [he] was among the first to step forward and offer help," providing "many of the essential items that come with caring for four newborns." (N. Gross Ltr. of 10/19/25). Another describes that Mr. Abramoff was "always selfless in his willingness to support various charitable and worthy causes without seeking recognition or reward." (G. Kapen Ltr. of 10/16/25).

Those who have benefited emphasize that his support is offered "quietly and without fanfare" (B. Waldman Ltr. of 10/9/25), and that he "has quietly and consistently supported charitable causes, mentored others, and worked to make amends in meaningful ways." (Elie Pieprz Ltr. of 10/22/25). The consistent throughline is discretion—stabilizing families at their most vulnerable moments yet never seeking recognition.

### C. Mr. Abramoff's Dedication to His Community

Over the decades, Mr. Abramoff has devoted time, resources, and leadership to sustain the spiritual life of his community. As Rabbi Tzvi Teitelbaum, a longtime friend and mentor of Mr. Abramoff, explains: "Together with his lovely wife, Pam, they have been pillars of our

9

community embodying sincerity, dedication, humility and kindness." (Rabbi Teitelbaum Ltr. of 10/22/25; R. Mendlowitz Ltr. of 10/18/25 ("Jack has been a loyal and dedicated member of our community, consistently demonstrating his strong religious convictions and a genuine commitment to the betterment of those around him … His contributions have not only enriched our spiritual community but have also positively impacted the lives of countless individuals.")).

To this end, multiple letters attest to his practice of opening his home as a place of refuge and community. Mr. Abramoff and his wife "opened their home to host out-of-towners in need of a place to stay, friends and strangers in need of a warm meal, and to local charities looking for someone to host an event," a graciousness and generosity that "typif[ies] the character of the Jack Abramoff we know." (*Id.*). When the Abramoff's longtime friends were between homes, "they offered their home to us, unasked, for as long as we needed it," providing "a stable and warm place to stay during a very stressful period." (K. and S. Sragg Ltr. of 10/19/25; *see also* J. Dunkin Ltr. of 10/16/25 ("I first met Jack when I was a law student. He opened his home to my future wife, who lived with his family while we were dating and engaged."); Moses Lapin Ltr. of 10/24/25 (Mr. Abramoff converted "some of the rooms [in his home] into places for boarders to stay, often for years. My cousin Devora and my sister Livia both stayed with them at various points, in addition to a hoard of international high school students.")).

Aside from opening his home to those in need, Mr. Abramoff's home became central to the community. He was known for "making his home available to the synagogue for essential events." (Barry Graham Ltr. of 10/21/25). He even "converted the basement into a synagogue to serve practicing Jews in the area." (Moses Lapin Ltr. as of 10/24/25).

D.    **Mentorship, Ethical Guidance, and Second-Chance Advocacy**

Another recurring theme throughout the letters is that Mr. Abramoff's is a hands-on mentor who coaches others through difficult situations and actively helps with jobs and

professional growth. Mr. Abramoff is known as a "mentor who inspires at-risk youth to pursue education, work hard, contribute to society, and build meaningful lives." (Zalman Silber Ltr. of 10/22/25). And many describe him as an "incredible mentor" (Jared Dunkin Ltr. of 10/16/25), who offers "consistent, thoughtful advice and mentorship." (Adam Canning Ltr. of 10/11/25). Mr. Abramoff "always makes himself available to offer expert insight and historical perspective on [a] wide variety of topics" (Peter Tilden Ltr. of 10/21/25), and "provide[s] guidance both professionally and personally." (Jason Osborne Ltr. of 10/22/25); Steven Abramoff Ltr. of 10/8/25 ("When I have been faced with challenging times in my life, I have reached out to Jack for his advice and he has always been a cheerleader to me. He has been supportive the way that only a good and loving person can be.")).

### E. Mr. Abramoff's Other Activities

Mr. Abramoff's activities extend beyond his help to humanity. The president of a longstanding animal rescue organization who has known Mr. Abramoff for over ten years remarked that "he and his family have adopted several dogs from us," and that he "has not only been fully committed to each of them, often calling for advice to do his best for them, but he also became a good friend." (Ardis Braun Ltr. of 10/7/25).

Moreover, in recent years, Mr. Abramoff has dedicated his life to and led ambitious efforts to preventing international deforestation and lifting up communities dependent on threatened ecosystems. A longtime business associate describes that he "has devoted his life to confronting … the accelerating destruction of the world's forests," and "built an organization dedicated to halting man-made deforestation and restoring vital forest cover in numerous nations." (Zalman Silber Ltr. of 10/22/25).

### III. MR. ABRAMOFF'S DEDICATION TO HIS FAMILY

One of Mr. Abramoff's defining characteristics is his close bond with his family. His life has been consistently anchored by the love, support, and responsibilities he shares with his spouse, his five children, and his grandchild, reflecting a deep commitment to family that continues to shape his daily choices and long-term goals. As his wife explains, Mr. Abramoff "is a loving and supportive husband, a devoted father, and a doting grandfather whose warmth and presence brighten the lives of everyone around him." (Pam Abramoff Ltr. of 10/20/25).

Almost every letter from Mr. Abramoff's longtime friends details the devotion Mr. Abramoff has to his family. He is described by friends as "devoted family man who cares deeply for his wife, children, and granddaughter" (Shmuel Feldman Ltr.), "a devoted husband and a wonderful father" (Steve Bowling Ltr. of 10/10/25), and a person who "share[s] a wonderful, loving relationship" with his wife. (Neil Gross Ltr. of 10/19/25). Others note that it is "impossible to overlook Jack's devotion to his family, which has remained his constant source of strength" (William Nixon Ltr. of 10/23/25), and friends "admire … him most [for] his love of family." (Craig Holman Ltr. of 10/10/25).

Mr. Abramoff's brother, cousin, and children also submitted letters to the Court detailing the devotion Mr. Abramoff has to his family. The Court is respectfully referred to those letters for their contents. (*See* Steven Abramoff Ltr. of 10/8/25; Robert Abramoff Ltr. of 10/8/25; Lev Abramoff Ltr. of 10/10/25; Alex Abramoff Ltr. of 10/20/25; Daniel Abramoff Ltr. of 10/9/25; Sarah Abramoff Ltr. of 10/23/25; Livia Abramoff Ltr).

### IV. FACTS OF MR. ABRAMOFF'S CASE

Mr. Abramoff respectfully refers the Court to Mr. Abramoff's Plea Agreement, the PSR and the Government's 5K Letter for a recitation of the facts of Mr. Abramoff's case.

## V.   A NON-CUSTODIAL SENTENCE OF PROBATION IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO SATISFY THE OBJECTIVES OF 18 U.S.C. § 3553(A)

Mr. Abramoff respectfully submits that a non-custodial sentence with a period of supervised release is a "sentence sufficient, but not greater than necessary," to serve the purposes set for in 18 U.S.C. § 3553(a). Accordingly, Mr. Abramoff respectfully requests that he receive a non-custodial sentence of probation for a period not to exceed 3 years.

### A.   A Doward Departure is Warranted Because of Mr. Abramoff's Substantial Cooperation

Mr. Abramoff recognizes the seriousness of his crimes and its impact on the victims. PSR ¶21.[1] Consistent with that recognition, Mr. Abramoff has spent the past five years attempting to atone for his wrongdoing by not only cooperating with the Government but also ultimately testifying at Andrade's trial. With Mr. Abramoff's assistance and testimony, Andrade was found guilty and sentenced to 84 months in prison.

Several aspects of that cooperation are particularly noteworthy:

**Timeliness**: Mr. Abramoff pleaded guilty to the Information less than a month after being charged. Upon pleading guilty, Mr. Abramoff attended numerous meetings and proffers with the Government, which continued over a 5-year period. Further, Mr. Abramoff provided timely information relevant to the continued prosecution of Andrade and preparation for trial. It was during the start of preparing for his testimony in the Andrade case that Mr. Abramoff was diagnosed with cancer. Even with that diagnosis and his very frail physical condition, he continued the preparation sessions with the Government. During the following weeks as he was

---

[1] As noted in the PSR, the Probation Department recommends a two-level decrease under USSG §3E1.1(a) because Mr. Abramoff "has clearly demonstrated acceptance of responsibility for the offense." PSR ¶55. The Probation Department also recommends an additional one-level decrease under USSG §3E1.1(b) because Mr. Abramoff "assisted authorities in the investigation or prosecution of the defendant's own misconduct by timely notifying authorities of the intention to enter a plea of guilty." PSR ¶54.

13

going through grueling chemotherapy sessions, Mr. Abramoff continued to meet with the Government over zoom to prepare for the trial testimony. At some meetings, Mr. Abramoff would sit for hours and never complain – even though he was struggling greatly and battling for his life.

**Significance and Usefulness**: Mr. Abramoff provided critical first-hand information that led to the successful investigation and prosecution of Andrade. Much of the information provided to the Government could not have been obtained from any other person. From the start, Mr. Abramoff has done everything asked of him by the Government as a cooperating witness. In fact, despite being diagnosed with Stage IV Non-Hodgkin's lymphoma in September 2024 and undergoing chemotherapy, Mr. Abramoff testified at trial against Andrade in February 2025.

**Truthfulness**: Immediately after pleading guilty, Mr. Abramoff was forthcoming and truthful about his own conduct and that of Andrade. From the first counsel proffer with the Government, Mr. Abramoff made it clear that he would take responsibility for his role in the crimes, and went further by immediately assisting the Government in its investigation and prosecution of Andrade. Ultimately, Mr. Abramoff's candid and truthful testimony during Andrade's trial played a pivotal role in the Government obtaining a guilty verdict against Andrade.

Notably, notwithstanding his cancer diagnosis in September 2024, Mr. Abramoff continued to cooperate and assist with the Government in advance of Mr. Andrade's trial while receiving chemotherapy. In February 2025, only 3 months after his cancer diagnosis, Mr. Abramoff testified at Mr. Andrade's trial, and played a pivotal role in assisting the Government obtain a guilty verdict against Mr. Andrade. Specifically, Mr. Abramoff attended numerous preparation sessions with the Government leading up to Mr. Andrade's trial, while Mr. Abramoff was weak from chemotherapy. Ultimately, in his weakened state, Mr. Abramoff testified at *trial*

*for two full days*.

On March 12, 2025, a jury convicted Andrade of wire fraud and money laundering. And, on July 29, 2025, this Court sentenced Mr. Andrade to 84 months in prison.

In addition to substantial and significant cooperation in the Andrade case, Mr. Abramoff also cooperated with the Government on two separate investigations. One investigation was a sensitive matter, in which Mr. Abramoff worked closely with the FBI. He attended numerous meetings, and provided essential information. He also took on significant personal risk by exposing himself to the parties of interest. The second investigation related to the foreign corrupt practices act and resulted in Mr. Abramoff working closely with federal investigators. He had numerous meetings and provided voluminous information to the Government. At all times Mr. Abramoff was forthcoming, trustworthy, and his information proved to be valuable.

### B. A Downward Variance is Warranted Because of Mr. Abramoff's Health, Age, and Exceptional Charitable and Good Works

"There is a longstanding tradition in American law, dating back to the dawn of the Republic, that a judge at sentencing considers the whole person before him or her 'as an individual.'" *Concepcion v. United States*, 597 U.S. 481, 496 (2022) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)); *see also id.* ("For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender.") (quoting *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)). "Indeed, '[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Concepcion*, 597 U.S. at 492 (quoting *Koon*, 518 U.S. at 113).

A careful consideration of a defendant's history and characteristics "ensures that the punishment will suit not merely the offense but the defendant." *Pepper*, 562 U.S. at 488 (quoting *Wasman v. United States,* 468 U.S. 559, 564 (1984)). Today, that requirement is embodied in 18 U.S.C. § 3553(a), which instructs the Court to consider "the history and characteristics of the defendant" and "impose a sentence sufficient, but not greater than necessary," to serve the ends of justice.

**Mr. Abramoff's Health and Age**. The PSR notes that, "[i]n sentencing the defendant, Court may wish to consider that he is a 66-year-old man recently treated for Stage 4 cancer." PSR ¶118. Mr. Abramoff submits that, under U.S.C. § 3553(a), both Mr. Abramoff's cancer diagnosis and his age should be considered when determining the appropriate sentence.

As explained above (in Section I(E)), Mr. Abramoff, in September 2024, was diagnosed with Stage IV Non-Hodgkin's lymphoma. (Dr. N. Wagner-Johnston Ltr.). Since that time, Mr. Abramoff achieved remission, but only after he was treated with chemotherapy which led to significant side-effects. (*Id.*). As Mr. Abramoff's doctor explains, despite achieving remission, his cancer is not considered cured until he remains in remission for five years, and, as noted above, he remains immunosuppressed and is at high risk for infections. (*Id.*).

Moreover, aside from Mr. Abramoff's health, his age (now 66) makes it highly unlikely that he will reoffend. According to a Sentencing Commission study, recidivism rates decrease markedly as an individual gets older, and individuals age 60 or older are far less likely to reoffend than younger offenders. *See* U.S. Sent'g Comm'n, The Effects of Aging on Recidivism Among Federal Offenders, (Dec. 7, 2017) at 3 ("Older offenders were substantially less likely than

16

younger offenders to recidivate following release. Over an eight-year follow-up period, 13.4 percent of offenders age 65 or older at the time of release were rearrested.").

Accordingly, the need for the sentence to "protect the public from further crimes of the defendant," 18 U.S.C. § 3553(a)(2)(C), militates against the imposition of a custodial sentence.

**Mr. Abramoff's Charitable Involvement, Good Works and Family Ties**. Pursuant to § 3553(a), the sentencing judge has authority to consider matters such as family ties, or civic, charitable, or public service. *See Rita v. United States*, 551 U.S. 338, 364–65 (2007) (Stevens J., concurring) ("Matters such as age, education, mental or emotional condition, medical condition (including drug or alcohol addiction), employment history, lack of guidance as a youth, family ties, or military, civic, charitable, or public service are not ordinarily considered under the Guidelines. These are, however, matters that § 3553(a) authorizes the sentencing judge to consider.").

As detailed above (*see* Sections II, and II), Mr. Abramoff has dedicated his life to his family, charity, and acts of kindness to others. As such, Mr. Abramoff respectfully requests that the Court consider these matters when considering the appropriate sentence.

**Mr. Abramoff's Criminal History is Over-Represented**. As part of Mr. Abramoff's Plea Agreement, the parties agreed that a "one-category departure regarding the defendant's Criminal History Category is appropriate in order not to overstate the seriousness of his criminal history, to no more than a CHC II." (Plea at ¶8).

However, due to the recent changes in Sentencing Guidelines Manual implemented as of November 1, 2025, which deleted USSG §4A1.3, the PSR states that, "[a]ccording to the sentencing table in USSG Chapter 5, Part A, a criminal history score of six establishes a criminal history category of III." (PSR ¶60). Notwithstanding, the PSR recognizes the Plea Agreement,

17

and notes that "the Court may consider the granting a downward variance under 18 U.S.C. § 3553 to address this issue." (PSR at n.1).

Given the Plea Agreement, Mr. Abramoff respectfully submits that a downward variance is warranted under 18 U.S.C. § 3553 in order not to overstate the seriousness of his criminal history. As a result, Mr. Abramoff's Criminal History Category should be II, not III.

## CONCLUSION

For the reasons set forth above, Mr. Abramoff respectfully requests that he receive a non-custodial sentence of probation for a period not to exceed 3 years.

Dated: November 11, 2025

Respectfully submitted,

*Richard Weber*
Richard Weber
HAYNES AND BOONE LLP
30 Rockefeller Plaza, 22nd Floor
New York, NY 10112
Richard.Weber@haynesboone.com
(212) 835-4879

*Attorneys for Defendant Jack Abramoff*